## ARLO E. BROWNLEE AND ANOTHER v. JOHN H. ERTZOS.

182 N. W. (2d) 697.

December 31, 1970—No. 42078.

*Robins, Meshbesher, Singer & Spence, Russell M. Spence,* and *Morley Friedman,* for appellants.

*Karlins, Grossman, Karlins, Siegel & Brill, Allen C. Johnson,* and *Robert L. Lowe,* for respondent.

Heard before Knutson, C. J., and Otis, Peterson, Kelly, and Rosengren, JJ.

CHESTER G. ROSENGREN, JUSTICE.*

This is an appeal from a judgment of the district court in which the court denied appellant purchasers' prayer for specific performance of a written agreement for the conveyance of certain real estate. We affirm the district court's denial of specific performance, but remand for determination of damages for breach of contract. The facts leading to this action are as follows:

In 1967, John H. Ertzos, defendant herein, acquired the property in question by devise from a friend. The property is an apartment building containing four rental units, with a fifth unit which could not legally be rented because it did not meet the requirements of a pertinent Minneapolis ordinance. Ertzos, who had been living in this fifth unit, in 1968 listed the building for sale with South Realty. He informed the realtor that the fifth

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

unit could not be rented, but South Realty, after some weeks of unsuccessful listing, made reference to it in the following advertising:

"$31,900—LEGAL—4PLEX

"Just being redecorated. Has owners gorgeous 5th unit on floor 3—Not represented as legal. Live in & enjoy 4—2BR rented units. Now being remodeled. For address or more details call JEAN MATTSON. 869-9069 SOUTH 884-3251"

Appellants, Arlo E. and Gloria Brownlee, responded to the advertisement, and on October 14, 1968, they were shown the premises by a South Realty salesman, Donald Upton. Ertzos returned to the premises near the end of the showing, and the Brownlees discussed with him certain plumbing repairs then in progress. The evidence is conflicting as to whether any mention was made at that time about remodeling the fifth unit for legal rental.

Thereafter the Brownlees went with Upton to the offices of South Realty where they prepared, in the form of a purchase agreement, an offer to be presented to Ertzos. Upton drafted the agreement, incorporating provisions requested by Brownlee, and the document was then typed by Mrs. Brownlee.

The following evening, three representatives of South Realty, Upton, Robert Miller, and Mrs. Jean Mattson, the family of the latter being friends of Ertzos, presented the purchase agreement to Ertzos for his approval. These agents generally testified that they went over the contract in detail with Ertzos, explaining its terms and discussing his objections. The agents, whose efforts to obtain a buyer had hitherto been unsuccessful, apparently persuaded Ertzos to accept the offer and sign the agreement even though it was not in accordance with that contemplated in the original listing agreement. The agreement which Ertzos signed provided for a purchase price of $31,900, and—

"Earnest money herein paid $500.00 and $3,000.00, cash, on or before Nov. 20, 1968 Closing date. $28,400.00 by the buyer

secured financing 7¼% on the first mortgage and 7% on the contract for deed. Payment on contract for deed to be figured at 1% of the total contract for deed on the 20th day of each month and payment to be applied first to interest and the balance to the principal each month for the total of 84 months at which time contract for deed balance is due.

"Work to be completed: new bath tubs and plumbing in all five (5) apartments to pass City inspection including the third floor to be a legal rental unit. Apartment on lower West side—kitchen and decorating to be completed in a workman like manner. Apartment on East side, 2nd floor ceiling and walls to be repaired and apartment decorated. The walls in all the bathrooms to be finished—lower in tile board and the upper painted.

"All heating units to be in working order at the time of possession."

The next morning, about 7 hours after having signed the agreement, Ertzos telephoned Mrs. Mattson and requested that she cancel the agreement. At that early hour, Mrs. Mattson was unable to contact Upton, who had already left his home to deliver the purchase agreement to the Brownlees.

On October 30, 1968, Upton, apparently with Ertzos' permission, went to the city engineer's office to obtain an authorization for a building permit to legalize the fifth unit. That authorization indicated that legalization, at least preliminarily, would entail construction of fireproof partitions and floor separations, fireproof doors, and revamping of stairways. Subsequently, an estimate of $4,800 was obtained from a contractor for such improvements.

Ertzos refused to perform, and the Brownlees brought this action for specific performance and damages. The district court denied the prayer for specific performance; did not mention the Brownlees' alternative request for damages; and awarded recovery against Ertzos for the $500 earnest money paid by the Brownlees.

The trial court found that there was a lack of understanding between Ertzos and the broker as to whether in listing the property mention should have been made of the possibility of making the fifth unit legal for rental and found generally a misunderstanding by Ertzos of the offer, evidenced by the fact that the brokers had spent 3 hours with Ertzos before he signed the agreement. The court determined that because of the confusion in the listing agreement and the confusing and indefinite provisions contained in the "Purchase Agreement," the transaction sought would work a severe hardship not fairly contemplated by the parties to the action. The court concluded:

"Inasmuch as the Court in this matter has been called upon to exercise equitable powers, and to compel the performance of a contract to convey real estate, founded upon mistake and confusion made by the defendant originally when creating the real estate broker as his agent and carried on further in the presenting to the defendant of the said 'Purchase Agreement' under the circumstances here involved, the Court has found that it would be inequitable, impractical and almost impossible to decree specific performance and carry out the provisions of such performance between the parties in an adequate and equitable and just manner."

The issues presented may be phrased as follows: First, whether there was adequate support for the trial court's determination that there was on the part of the vendor a unilateral mistake with respect to the terms of a purchase agreement; and, in view thereof, second, whether the court erred in denying specific performance of an agreement to convey real estate; and, if not, third, whether the court erred in not considering appellants' alternative plea for damages for breach of the purchase agreement.

The trial court apparently based its decision both upon a finding of mistake on the part of Ertzos and upon the indefiniteness of the contractual terms. The question of support for each of

these findings is important, for a finding of unilateral mistake may justify both a denial of specific performance and, under some circumstances, a grant of equitable rescission, whereas, a finding of indefiniteness, by itself, serves only to preclude specific enforcement, leaving open the question of damages for breach of contract.

An extensive examination of the record presented in this case suggests that there was not sufficient evidence to warrant a finding of unilateral mistake on the part of Ertzos. It should be noted first of all that it is not entirely clear that the trial court specifically found there was unilateral mistake respecting the contract itself. Instead, the court's conclusion of "confusion, uncertainty and the lack of meeting of the minds, at least of the defendant, relative to the terms and provisions of said 'Purchase Agreement,'" was based largely upon the fact that the "Purchase Agreement," as presented, varied from the terms which Ertzos had sought in his listing arrangement with the broker. Thus, it was in light of that uncertainty, together with the fact that the terms of the contract itself were somewhat indefinite, that the court apparently determined that specific enforcement would be "inequitable, impractical and almost impossible to decree."

The mere fact that the purchase agreement presented to Ertzos varied from that which he had contemplated when he entered the listing agreement does not demonstrate that there was any mistake with regard to the purchase agreement itself. It does not appear in the record that Ertzos failed to understand the terms of the purchase agreement. Indeed, a thorough examination of the transcript compels the conclusion that Ertzos was aware of the departure of the offer from the listing agreement and that much of the 3 hours with the real estate agents was spent in discussing the terms of the offer, the discussion focusing at least in part upon the proposed "legalizing" of the fifth unit. The testimony of Ertzos evidences self-contradiction as to whether he understood the contract and whether he thought the

fifth unit could be legalized. He testified that he did not understand the terms relating to financing and that the contract was "confusing"; he also testified, however, that he read the contract, knew it called for legalizing the fifth unit, and knew that he was to take a contract for deed. As to legalization, Ertzos first testified that when he signed the contract he thought legalization would be easy, having received that impression from the building inspector, but that later he learned to the contrary. At a later point in the proceedings, however, Ertzos testified that when he signed the contract, he "knew" the fifth unit could not be legalized and that when he signed the contract he had no intention of satisfying each of the obligations contained in that instrument.

Against the foregoing confusing assertions of Ertzos, there is the testimony of his own real estate agents indicating that Ertzos did in fact understand what was in the contract; that he did realize that some of the provisions differed from what he had hoped to obtain when he entered into the listing agreement; and that nonetheless he signed the agreement, apparently convinced by his agents that the offer—the only one forthcoming in 5 or 6 weeks of listing—was a good one. Robert Miller, one of the agents present when the offer was submitted to Ertzos, testified that the terms of the purchase agreement were thoroughly discussed, including terms for payment, costs of repairs and redecorating, and whether, and at what cost, the fifth unit could be legalized. Mrs. Mattson generally corroborated this recitation. She testified that at the time of the listing she had conversations with Ertzos concerning his taking a contract for deed for part of the purchase price on this old building; that Ertzos had told her he was thinking of legalizing the fifth unit; that he had obtained a plumbing estimate for work being done on the building, including the third floor; and that the morning following his signing the contract Ertzos called her and was "a little upset," stating he had talked with one "Jerry," who had told him he was foolish to sign the contract and that if he legalized the fifth

unit, he could probably get $40,000 or $45,000 for the property. Ertzos denied having made such a statement. Donald Upton, the third agent present when Ertzos signed the contract, corroborated the testimony that much of the conversation about the contract related to its substantive provisions and to repairs called for by the instrument.

As the foregoing discussion suggests, it appears from an examination of the evidence as a whole that a finding that there was on the part of Ertzos such a mistake as would vitiate the contract is not warranted. Instead, it appears that Ertzos did understand the terms of the contract and entered it consciously. Significantly, at no time was there even any suggestion of improper conduct on the part of the Brownlees.

On an appeal such as this one, the trial judge's findings are entitled to great weight, and the function of this court is to determine, viewing the evidence in the light most favorable to the prevailing party, whether that evidence as a whole supports the court's findings. Boulevard Plaza Corp. v. Campbell, 254 Minn. 123, 94 N. W. (2d) 273; Caroga Realty Co. v. Tapper, 274 Minn. 164, 169, 143 N. W. (2d) 215, 220. "* * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Rule 52.01, Rules of Civil Procedure.

Even under the foregoing restrictions on appellate review of findings of fact, however, it is clear that in this case this court must set aside the trial court's findings of fact concerning alleged mistake on the part of Ertzos. If the finding were based simply upon a balancing of the credibility of Ertzos against that of the other witnesses, respect for the trial court's discretion would prevail. However, in the case at hand, it seems there is adequate testimony from Ertzos himself to negate a finding of mistake.

Thus, since it appears that the contract was not vitiated by any unilateral mistake on the part of Ertzos, the question on this

appeal becomes whether the trial court acted properly in denying specific performance and in disregarding the alternative pleas for partial specific performance or damages.

Traditionally, in order for a court to grant specific performance of a contract, the terms of that contract had to be "so specific and distinct as to leave no reasonable doubt of their meaning." 17 Dunnell, Dig. (3 ed.) § 8781. In recent years, that historical insistence upon specificity has been relaxed somewhat, and this court has ordered specific performance of a contract containing some indefinite terms.

Kennedy v. Hasse, 262 Minn. 155, 114 N. W. (2d) 82, involved a contract for the sale of a hardware store for about $39,000, $3,683 of which was to be secured by "a factors lien or chattel mortgage." Because the contract did not specify the nature of the property so to be secured, the defendant resisted specific performance on the ground that this provision was too indefinite for enforcement. This court affirmed the lower court's grant of specific enforcement, stating that the ambiguity related to less than 10 percent of the purchase price and that it could be inferred that the parties intended the "factors lien or chattel mortgage" to relate to the merchandise and equipment sold with the store. In the course of the opinion, we stated (262 Minn. 162, 114 N. W. [2d] 87):

"* * * It is not necessary that every possible question be answered in advance by the parties before a contract can be enforced; it is only necessary that the intent of the parties as to fundamental terms be ascertainable with reasonable certainty."

Moreover, in King v. Dalton Motors, Inc. 260 Minn. 124, 126, 109 N. W. (2d) 51, 53, this court observed:

"* * * [T]he law does not favor the destruction of contracts because of indefiniteness, and if the terms can be reasonably ascertained in a manner prescribed in the writing, the contract will be enforced."

On the other hand, when it appears that a contract has left open for future agreement or negotiation the terms of payment for property, it is clear that the contract is not specifically enforceable. Annotation, 68 A. L. R. (2d) 1221; King v. Dalton Motors, Inc. *supra*; Rahm v. Cummings, 131 Minn. 141, 155 N. W. 201; Leslie v. Mathwig, 131 Minn. 159, 154 N. W. 951; Erickson v. Nelson, 275 Minn. 561, 146 N. W. (2d) 768. But cf. Lankton v. Stewart, 27 Minn. 346, 7 N. W. 360.

The contract involved in the case at hand does not fall clearly into either of the foregoing categories of cases. Its terms are more indefinite than those in any contract enforcement of which has been ordered by this court. The purchase agreement for which enforcement is here sought is indefinite both as to terms of payment and as to the extent and nature of repairs and alterations required by it. The agreement provided for financing by way of a first mortgage bearing interest at the rate of $7\frac{1}{4}$ percent and a contract for deed bearing interest at the rate of 7 percent to secure the remainder of the purchase price. The indefiniteness in this provision stems from the fact that the relative amounts of the mortgage and contract for deed are not specified although the rates of, and periods for, payment on the contract for deed are specified. Thus, in regard to terms for payment, the agreement here involved seems analogous to those involved in Rahm v. Cummings, *supra*, in which specific performance was denied where a purchase agreement failed to specify the time for payment on a mortgage referred to therein; and in Leslie v. Mathwig, *supra*, in which specific performance was denied where the contract in question provided for a down payment with the balance "to be arranged by adjustment of mortgages." Although there is some suggestion in the record of this case that the relative amounts of the mortgage and the contract for deed were not left open for future negotiations, but were left indefinite with the understanding that the purchasers should procure as large a mortgage as possible, we are constrained to hold that such indefiniteness as to terms for pay-

ment, in conjunction with other areas of indefiniteness contained in the purchase agreement, requires that specific enforcement be denied.

Although we are not foreclosing the possibility that a case could arise in which resort to evidence outside the instrument might be appropriate to cure ambiguous language and thus to permit specific enforcement, it is clear from the record before us that this is not such a case. In this case, the indefiniteness of the terms for payment relates to almost the entire purchase price and not to only a small portion thereof, as was the situation in Kennedy v. Hasse, *supra.*

Moreover, the difficulties of enforcing the contract here in question are compounded by the fact that the contract is indefinite as to the terms of the work-to-be-completed provision, which generally requires certain plumbing and redecorating, and that the third floor be a "legal rental unit." As to what is required to make the third floor a "legal rental unit," the contract is silent. Subsequent to the signing of the contract, the real estate agent procured an "Engineer's Approval for Permit" in which the Minneapolis Department of Inspections set forth in summary form certain alterations to be made to the building. Apparently, if those alterations are made and the building then is able to pass city inspection, the third floor might be approved as a "legal rental unit." The contract itself, however, provides little guidance as to just what work was required in this respect and, even with the Engineer's Approval for Permit, exactly what is required remains unclear. Moreover, no date is specified for completion of such alterations and no provision is made as to their quality or cost. Because of such vagueness as to repair requirements and because of the indefiniteness as to the completion date for all repairs, it is apparent that a decree for specific performance, even if the terms of the contract could be ascertained with reasonable certainty, could require continuing supervision by the court. In addition, we are also aware of the probable impos-

sibility of finding any lender presently willing to lend money at 7¼ percent.

Upon consideration of these factors, it is the conclusion of this court that the district court properly denied appellants' request for specific enforcement. It is our conclusion, however, that the purchase agreement, even though not susceptible of specific enforcement, nonetheless was a binding contract. The cause must therefore be remanded for determination of appellants' alternative claim for damages on the contract. That course of action is suggested by this court's decision in Gethsemane Lutheran Church v. Zacho, 258 Minn. 438, 443, 104 N. W. (2d) 645, 648, in which it is stated:

"* * * Where exceptional circumstances make specific performance inequitable or inappropriate, the court may award compensation or damages in lieu thereof."

In view of the circumstances here presented, it is apparent that such a case is now before this court. Thus, in the event of continued nonperformance by the seller, the purchasers are entitled to damages on the contract. The proper measure of such damages should be the $500 earnest money paid, plus the reasonable market value of the premises on the contract's closing date (November 20, 1968), less the contract purchase price of $31,900. The "reasonable market value" of the premises on that date is to be determined upon the assumption that all repairs and alterations had been made as contemplated by the parties in accordance with the contract and that as of November 20, 1968, the premises would have consisted of five legal rental units. The case is accordingly remanded for determination of damages in accordance with this opinion.

Remanded.